**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATURAL RESOURCES DEFENSE
COUNCIL, INC.; EAST YARD
COMMUNITIES FOR ENVIRONMENTAL
JUSTICE; COALITION FOR A SAFE
ENVIRONMENT; and ENDANGERED
HABITATS LEAGUE,
                              *Petitioners,*

            v.

UNITED STATES ENVIRONMENTAL            No. 08-72288
PROTECTION AGENCY,
                                       OPINION

                       *Respondent,*

            and

SOUTHERN CALIFORNIA
ASSOCIATION OF GOVERNMENTS; and
SOUTH COAST AIR QUALITY
MANAGEMENT DISTRICT,
            *Respondent-Intervenors.*

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted
November 4, 2010—Pasadena, California

Filed March 30, 2011

Before: J. Clifford Wallace and Susan P. Graber,
Circuit Judges, and Richard Mills,* Senior District Judge.

Opinion by Judge Graber

---

*The Honorable Richard Mills, Senior United States District Judge for
the Central District of Illinois, sitting by designation.

## COUNSEL

Robert E. Yuhnke, Robert Yuhnke & Associates, Boulder, Colorado; and Adriano Martinez, Natural Resources Defense Council, Santa Monica, California, for the petitioners.

Heather E. Gange, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for the respondents.

Barbara Baird, South Coast Air Quality Management District, Diamond Bar, California; and Joanna G. Africa, Southern California Association of Governments, Los Angeles, California, for the intervenors.

John P. Dwyer, Dwyer & Biggs LLP, San Francisco, California, for the amicus curiae.

**OPINION**

GRABER, Circuit Judge:

Pursuant to the Clean Air Act, the Environmental Protection Agency ("EPA") regulates emissions of particles known as particulate matter. In order to meet statutory and regulatory requirements, California submitted a state implementation plan ("SIP") to the EPA for its approval. The SIP contains, among many other things, limits on motor vehicle emissions for the years 2009 and 2012. Although the EPA's overall approval process of the SIP is still underway, the agency has made a preliminary finding that the SIP's limits on motor vehicle emissions for years 2009 and 2012 are adequate for purposes of the state's transportation plans and projects. The EPA's adequacy determination allows California to approve transportation plans and projects that otherwise could not proceed. Pursuant to 42 U.S.C. § 7607(b)(1), several environmental groups filed this petition for review. Petitioners assert that the EPA's adequacy determination was arbitrary, capricious, or otherwise contrary to law. We deny the petition.

FACTUAL AND PROCEDURAL HISTORY

A.   *Air Quality Standards and State Implementation Plans*

The general statutory background concerning air quality standards and SIPs is common to many cases:

> The Clean Air Act, 42 U.S.C. §§ 7401-7671 ("Act"), establishes a comprehensive program for controlling and improving the United States' air quality through state and federal regulation. The Act requires the EPA to establish national ambient air quality standards ("NAAQS") for air pollutants that the EPA determines may reasonably be expected to endanger public health or welfare. 42 U.S.C. §§ 7408, 7409.

The states are responsible for ensuring that their air quality meets the NAAQS. *Id.* § 7407(a). The states are divided into "air quality control regions," and each region is designated as being either in attainment or nonattainment, or as unclassifiable with respect to each of the NAAQS. *Id.* § 7407(d). The attainment deadlines and control measures applicable within each region vary, depending on the pollutant and the severity of the region's pollution problem. *See id.* §§ 7502, 7509, 7511-7514a.

Under the Act, a state must develop a SIP that provides for the attainment, maintenance, and enforcement of the NAAQS in each region within the state. *Id.* § 7410(a). Section 7410 sets forth the general requirements for all SIPs, which include enforceable emission limitations and other control measures to meet the requirements of the Act; enforcement programs; and assurances that the state has adequate personnel, funding, and authority to carry out the SIP. Every SIP or SIP revision must be adopted by the state after reasonable notice and hearing, and each must be submitted to the EPA for approval. *Id.* § 7410(a)(1). The EPA may fully approve, partially approve and partially disapprove, conditionally approve, or fully disapprove a SIP. *Id.* § 7410(k)(3) & (4).

*Latino Issues Forum v. EPA*, 558 F.3d 936, 938 (9th Cir. 2009).

For areas designated "nonattainment," the Act requires that a SIP meet certain specifications. 42 U.S.C. § 7502(c). Relevant here, the SIP must provide for "attainment" of the NAAQS by the attainment deadline, *id.* § 7502(c)(1), and it also must provide, in the interim years, for "reasonable further progress" toward the goal of attainment. *Id.* § 7502(c)(2). "The term 'reasonable further progress' means such annual

incremental reductions in emissions of the relevant air pollutant as are required by this part or may reasonably be required by the Administrator for the purpose of ensuring attainment of the applicable [NAAQS] by the applicable date." *Id.* § 7501(1).

In the part of the SIP known as the "control strategy implementation plan revision," the state must describe "specific strategies for controlling the emissions of and reducing ambient levels of pollutants in order to satisfy [statutory] requirements for demonstrations of reasonable further progress and attainment." 40 C.F.R. § 93.101. Additionally, the state must allocate allowable emissions for each year between motor vehicles and all other sources (e.g., factories and power plants). *Id.* The state's "budget" of emissions from motor vehicles for a given year is known as the "motor vehicle emissions budget." *Id.* "Motor vehicle emissions budget is that portion of the total allowable emissions defined in the submitted or approved control strategy implementation plan revision or maintenance plan for a certain date for the purpose of meeting reasonable further progress milestones or demonstrating attainment or maintenance of the NAAQS . . . ." *Id.*

B.   *Regulation of Particulate Matter*

"Particulate matter is the generic term for a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a wide range of sizes." National Ambient Air Quality Standards for Particulate Matter, 62 Fed. Reg. 38,652-01, 38,653 (July 18, 1997) ("1997 NAAQS Rule"). The EPA regulates particulate matter as an air pollutant for purposes of the Clean Air Act. *Id.* The EPA originally regulated all particulate matter as a single class. *Id.* at 38,653-54. In 1987, the EPA created a subclass of particulate matter: all particles with a diameter equal to or less than 10 micrometers, referred to as "PM-10." *Id.*

In 1997, spurred by extensive scientific research into the deleterious effects of very small particles, the EPA added to

the list of regulated air pollutants a new subset of particulate matter: those particles with a diameter equal to or less than 2.5 micrometers, referred to as "PM-2.5." *Id.* at 38,654. In 2006, the EPA imposed more stringent air quality requirements by decreasing the acceptable level of PM-2.5. 71 Fed. Reg. 61,144-01, 61,224 (Oct. 17, 2006) ("2006 NAAQS Rule").

The EPA has promulgated regulations describing the requirements for SIPs concerning PM-2.5. 40 C.F.R. §§ 51.1007-51.1009. The EPA designated 2002 as the default "baseline emission inventory" year to "be used for attainment planning" purposes. *Id.* § 51.1008(b). The EPA also specified requirements concerning a nonattainment area's plan for reasonable further progress. *Id.* § 51.1009. For certain SIPs, including the one at issue here, the SIP must "demonstrat[e] that reasonable further progress will be achieved for the 2009 and 2012 emissions years," known as "milestone years." *Id.* § 51.1009(c)(2). "The RFP plan must demonstrate that in each applicable milestone year, emissions will be at a level consistent with generally linear progress in reducing emissions between the base year and the attainment year." *Id.* § 51.1009(d). The rule details the specific calculations that correspond to a straight-line decrease in emissions from the emissions level in the base year to the target emissions level in the attainment year. *Id.* § 51.1009(f).

C.   *Transportation Projects and Transportation Plans*

The Clean Air Act requires that all federally funded transportation projects and transportation plans "conform" to the applicable SIP. 42 U.S.C. § 7506(c)(1), (2). Section 7506(c)(1) provides:

Conformity to an implementation plan means—

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and

number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not—

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

Those statutory requirements apply as soon as the state submits its SIP to the EPA for approval (and continue to apply after EPA approval). *Id.* The EPA has an "affirmative responsibility" to ensure conformity. *Id.* Those requirements mean, among other things, that a transportation project or plan cannot cause the applicable motor vehicle emissions budget to be exceeded. 40 C.F.R. § 93.118(a).

Although perhaps not obvious at first glance, the EPA's "affirmative responsibility" to ensure that transportation projects do not, for instance, "delay timely attainment," 42 U.S.C. § 7506(c)(1), puts the EPA in a difficult situation logistically. The EPA's approval process of a SIP, including the EPA's final determination whether the state's proposed motor vehicle emissions budget will meet the requirements of the Clean Air Act, can take a long time. But the statute requires that the EPA determine conformity for transportation purposes as soon as the state *submits* its SIP. *Id.* Without *approved* motor vehicle emissions budgets, however, state transportation agencies cannot determine whether transportation projects or plans will meet the statutory "conformity" requirements. *Id.*

The EPA attempted to resolve this tension by promulgating the 1997 conformity rule, codified at 40 C.F.R. § 93.118. Transportation Conformity Rule Amendments: Flexibility and Streamlining, 62 Fed. Reg. 43,780-01 (Aug. 15, 1997). The EPA decided that, once a state submits a SIP, the agency will conduct a "cursory review" of the submitted motor vehicle emissions budgets within a short time frame. *Id.* at 43,782. If the submitted budgets meet six specified minimum criteria, the EPA will deem the budgets "adequate for transportation conformity purposes." 40 C.F.R. § 93.118(e)(4).

Once the EPA deems a motor vehicle emissions budget "adequate," transportation projects and plans can proceed in accordance with that budget, even though the EPA has not given—and may never give—final approval to either the budget or the SIP. The EPA's notice in the Federal Register made clear that the adequacy determination is independent of the EPA's final approval or disapproval of the SIP; thus, the EPA may later disapprove a budget that the EPA previously had found adequate. *See* 62 Fed. Reg. at 43,782; *see also Sierra Club v. EPA*, 315 F.3d 1295, 1300 (11th Cir. 2002) ("There are two, discrete EPA actions relevant to this case: (1) EPA's action finding the [motor vehicle emissions budget] to be adequate for transportation conformity purposes, pursuant to 40 C.F.R. § 93.118(e); and (2) EPA's approval of the SIP, effected by notice and comment rulemaking. EPA has consistently recognized that these separate actions are different from each other." (footnote and some citations omitted)). The EPA explains in its brief to this court that, "[a]bsent such a process, transportation projects would, in many instances, soon come to a standstill while the region's SIP submittal was being reviewed."

Not long after the EPA promulgated the 1997 conformity rule, an environmental petitioner successfully challenged certain aspects of the adequacy review process in the District of Columbia Circuit.[1] *Envtl. Def. Fund v. EPA*, 167 F.3d 641,

---

[1] For certain EPA actions concerning air pollution, 42 U.S.C. § 7607(b)(1) grants jurisdiction to the courts of appeals over petitions for

650-51 (D.C. Cir. 1999). Importantly, however, the petitioner did not challenge the basic mechanism of this review process: The EPA can determine that a budget is "adequate for transportation conformity purposes" before the EPA makes a final determination to approve or disapprove a SIP or a budget.

The EPA revised the conformity rule to its present form in 2004. 69 Fed. Reg. 40,004-01, 40,038-47 (July 1, 2004). The EPA stated that the "final rule addresses only the procedures for making adequacy findings for submitted SIPs in accordance with the court decision. The final rule does not change the criteria listed in § 93.188(e)(4) of the rule for determining the adequacy of submitted SIPs, as the court did not address this provision in its decision." 69 Fed. Reg. at 40, 038.

Again, environmental petitioners sought review of the conformity rule in the District of Columbia Circuit. *Envtl. Def. v. EPA*, 467 F.3d 1329 (D.C. Cir. 2006). This time, the court held that, because the petitioners challenged only provisions that the EPA originally promulgated in 1997 and did not challenge the 2004 modifications, the petitioners' arguments were time-barred. *Id.* at 1333-34. In other words, the time had expired to challenge the EPA's overall process for making "adequacy" determinations. So long as the EPA conforms to its own regulations and does not change its interpretation of its regulations, the courts must not disturb the agency's action. *Id.* at 1334.

### D.    *South Coast Air Basin's Nonattainment Status*

One of the air quality control regions in California is "the

---

review. For EPA actions of general applicability, such as rulemaking, the District of Columbia Circuit is the appropriate forum. *Id.* For other EPA actions, such as the one challenged here, which is "locally or regionally applicable," the proper forum is the regionally appropriate court of appeals. *Id.*

South Coast Air Basin, comprising Orange County and portions of Los Angeles, Riverside, and San Bernardino Counties." *Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 740 (9th Cir. 2008). In 2005, the EPA designated the South Coast Air Basin as "nonattainment" with respect to PM-2.5. 40 C.F.R. § 81.305; Air Quality Designations and Classifications for Fine Particles (PM2.5), 70 Fed. Reg. 944-01 (Jan. 5, 2005). The relevant dates for the South Coast Air Basin with respect to PM-2.5 are as follows: The base year is 2004, the milestone years are 2009 and 2012, and the attainment year is 2015.[2]

In 2007, the California Air Resources Board, which is the state agency entrusted with preparing the SIP, submitted an implementation plan to the EPA for approval. That SIP contained, among other things, two sets of motor vehicle emissions budgets for PM-2.5. One set, labeled "baseline" budgets, contained budgets for the two milestone years only, and did not contain a budget for the attainment year. The baseline budgets reflected the anticipated emissions given the present-day restrictions on motor vehicles. The second set, labeled "SIP-based" budgets, contained budgets for the two milestone years and for the attainment year. The SIP-based budgets reflected more stringent emissions restrictions, in anticipation of future legislative and other uncompleted action.

Petitioners submitted extensive comments to the EPA in opposition to the proposed budgets. Among other things, Petitioners submitted scientific data and analyses demonstrating that levels of PM-2.5 are much higher in close proximity to

---

[2]There is some discrepancy concerning the precise attainment date, with some references made to an attainment date of 2014. This discrepancy may exist because, although the attainment date is 2015, the SIP specifies that "emission reductions needed for attainment must be in place by 2014." In any event, the precise attainment date is not at issue in this case. The parties agree, and the regulations confirm, that the base year is 2002 and that the milestone years are 2009 and 2012.

highways. Petitioners argued that, accordingly, the South Coast Air Basin could not achieve attainment without additional measures. Petitioners concluded that the alleged failure to demonstrate attainment was fatal to *all* of the motor vehicle emissions budgets, for both the milestone years and the attainment year.

By letter to the California Air Resources Board and subsequent publication in the Federal Register, the EPA found that the "SIP-based" budgets were *not* adequate for transportation conformity purposes because those budgets depended on emission-control measures that have yet to be implemented. The EPA also found, however, that the "baseline" budgets *were* adequate for transportation conformity purposes.

"As a result of [the agency's] adequacy finding, [transportation agencies] must use these ['baseline'] budgets in future transportation conformity determinations." The EPA explained: "The 'baseline' motor vehicle emissions budgets reflect emissions reductions from rules that were adopted as of October 2006 but, in contrast to the 'SIP-based' budgets, do not include new[, not yet implemented] emissions reductions from the State's strategy as reflected in the 2007 South Coast SIP."

The EPA provided a detailed analysis of why its findings complied with the six regulatory minimum criteria found at 40 C.F.R. § 93.118(e)(4). Relevant here, the fourth criterion states that the EPA can find a budget adequate only if the budget "is consistent with applicable requirements for reasonable further progress, attainment, or maintenance (whichever is relevant to the given implementation plan submission)." *Id.* § 93.118(e)(4)(iv). The EPA explained that the milestone-year "baseline" budgets were adequate for transportation purposes because those budgets "are consistent with the requirement to demonstrate reasonable further progress." The attainment-year "SIP-based" budget, however, was not adequate for transportation purposes because the EPA could not determine

that the budget is "consistent with the requirement to demonstrate attainment."

Petitioners timely filed this petition for review pursuant to 42 U.S.C. § 7607(b)(1). They challenge the EPA's adequacy determination with respect to the milestone-year baseline budgets.[3]

## STANDARDS OF REVIEW

Title 42 U.S.C. § 7607(b)(1) confers jurisdiction over petitions for review challenging many different types of agency actions, including an "adequacy" determination such as the one at issue here. The statute provides a standard of review for some types of agency actions covered by subsection (b)'s grant of jurisdiction, *id.* § 7607(d)(9), but the statute is silent on the standard of review for other types of agency actions, including the one before us. The Supreme Court has held that, in situations like this one, the courts of appeals must proceed pursuant to the Administrative Procedure Act's general standard of review for agency actions—5 U.S.C. § 706(2)(A). *Vigil v. Leavitt*, 381 F.3d 826, 833 (9th Cir. 2004) (citing *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496-97 & n.18 (2004)). Thus, we may set aside the challenged

---

[3]Petitioners include the Natural Resources Defense Council, Inc.; East Yard Communities for Environmental Justice; Coalition for a Safe Environment; and Endangered Habitats League. Although the EPA does not raise the issue of constitutional standing, we must consider it. *United States v. Hays*, 515 U.S. 737, 742 (1995). According to Petitioners, some of their members live within the South Coast Air Basin, including in close proximity to highways; nearby transportation projects have been approved because of the EPA's adequacy determination; and those projects will affect Petitioners' daily lives. Petitioners therefore have standing. *See Sierra Club v. EPA*, 129 F.3d 137, 139 (D.C. Cir. 1997) (holding that the petitioners had standing in an analogous context); *see also Massachusetts v. EPA*, 549 U.S. 497, 517-18 (2007) (discussing standing requirements for actions brought under 42 U.S.C. § 7607(b)(1)); *Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1105-06 (9th Cir. 2006) (stating the requirements for associational standing).

agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## DISCUSSION

Petitioners challenge the EPA's final agency action—its determination that the baseline budgets were "adequate" for transportation conformity purposes. Our jurisdiction is limited to deciding whether that decision was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. 5 U.S.C. § 706(2)(A); *see also* 42 U.S.C. § 7607(b) (describing the extent of jurisdiction); *Envtl. Def.*, 467 F.3d at 1332-33 (discussing the limits of jurisdiction under § 7607(b)). This limitation is important because, at many times in Petitioners' briefs, they appear to be challenging other, earlier actions by the EPA.

For instance, Petitioners appear, at times, to argue that the placement of air quality monitors is erroneous because none of those monitors is in close proximity to a highway. But as the government correctly points out, the placement of monitors was the subject of earlier rulemaking and, therefore, cannot be challenged in this action. In their reply brief, Petitioners properly concede that they are not challenging monitor placement. Similarly, Petitioners cannot now challenge the substance of the applicable rules concerning conformity. Those rules were promulgated in earlier years, and the 60-day window for filing petitions for review long ago closed. *Envtl. Def.*, 467 F.3d at 1332-33. In other words, Petitioners are limited to challenging the EPA's *application of those rules* to California's submitted motor vehicle emissions budgets. We turn, then, to that issue.

[1] Petitioners argue that the EPA failed to consider a relevant factor—attainment—when it made its adequacy determination concerning the milestone-year budgets. The EPA concedes that it did not consider Petitioners' attainment data

for purposes of the milestone-year budgets but argues that nothing requires it to do so. Therefore, the parties' dispute boils down to whether the EPA must consider attainment data when conducting its adequacy review of a budget for a milestone year.

That issue is properly before us. Generally, we must set aside an agency's action where it failed to consider mandatory factors set forth by statute or in a regulation. *Cerrillo-Perez v. INS*, 809 F.2d 1419, 1422 (9th Cir. 1987); *see also NRDC v. EPA*, 526 F.3d 591, 602 (9th Cir. 2008) ("An agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). This issue falls within the jurisdictional scope of § 7607(b)(1) because it questions whether the EPA's final agency action— its adequacy finding—properly applied the law to the facts at hand.

Petitioners argue that the Clean Air Act and the EPA's implementing regulations, coupled with court cases interpreting those sources of law, require the EPA to consider attainment data when determining the adequacy of milestone-year budgets. Before turning to those sources of law, it is helpful to describe the parties' positions on how they contend this area of the law works.

**[2]** The EPA asserts that, for a milestone year, a budget need only demonstrate reasonable further progress toward the ultimate goal of attainment. Because a milestone year occurs before the attainment year, it is not necessary to demonstrate that the state has implemented sufficient measures to reach attainment by the eventual attainment year. For purposes of

demonstrating reasonable further progress, it suffices that the state demonstrate that it will have reduced emissions to a level consistent with generally linear progress toward the target emissions level by the attainment date. In order to calculate emissions levels for a milestone year consistent with reasonable further progress, the only information related to attainment needed by the EPA is the *total target emissions* as of the attainment date. Once the EPA has calculated the total target emissions for the attainment year, a straight-forward linear calculation easily provides the target emissions for the milestone years. No other data concerning attainment are necessary or relevant.

In Petitioners' view, the EPA has the cart before the horse. According to Petitioners, it makes little sense to find that, even though the state cannot demonstrate how it will achieve the ultimate goal of attainment, the EPA nevertheless can determine the adequacy of the state's incremental steps toward achieving that ultimate goal. Petitioners make much of the EPA's admission that, in order to determine reasonable further progress, it must calculate the attainment-year target emissions level. Petitioners appear to argue that it is unreasonable to approve the *target emissions level*, even for purposes of adequacy review, if the EPA concedes that *the state cannot reach that target emissions level* through the proposed pollution-reduction measures.

**[3]** Once the state has demonstrated its ability to achieve attainment (at least for purposes of adequacy review), then—and only then—can the state reasonably back-calculate the intermediate emissions levels. The ultimate goal, after all, is attainment of the NAAQS. Reasonable further progress is *an extra requirement* to which some states must adhere. The EPA's approval, for adequacy purposes, of milestone-year budgets without a demonstration that the state can achieve attainment, permits the state to effect an end-run around the clear requirement of the Clean Air Act to achieve attainment.

Both the EPA's view and Petitioners' view are reasonable in the abstract. There is nothing illogical about the EPA's view that, although it will not approve an attainment-year budget where the state has not implemented enough measures, it nevertheless will use the attainment-year target emissions level to calculate intermediate-year emissions levels. Additionally, there is nothing illogical about the EPA's approval, for adequacy purposes, of the budgets corresponding to those intermediate years if the budgets independently meet the statutory and regulatory requirements.

At the same time, Petitioners' view—that the "reasonable further progress" goals should not be approved (for adequacy or other purposes) until the state has demonstrated that it will achieve attainment—also makes sense. After all, attainment is the goal, and approval of intermediate-year goals has the practical effect of allowing transportation projects to proceed before the state has demonstrated that it will achieve attainment.

**[4]** Although both views are reasonable in the abstract, the pertinent question is what choices Congress and the EPA made when they, respectively, enacted the Clean Air Act and promulgated implementing regulations. On that question, Petitioners argue that both the conformity rule and the PM-2.5 implementation rules required the EPA to consider attainment when making its adequacy determinations. In these circumstances, the deference owed to the agency cannot be understated:

> We must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. In other words, we must defer to the [agency's] interpretation unless an alternative

reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation. This broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations and internal quotation marks omitted).

A.   *Conformity Rule*

[5] Petitioners first argue that the EPA's action violated the conformity rule, originally promulgated in 1997, 40 C.F.R. § 93.118(e)(4). In particular, Petitioners challenge the EPA's finding concerning the fourth of the six criteria:

> EPA will not find a motor vehicle emissions budget in a submitted control strategy implementation plan revision or maintenance plan to be adequate for transportation conformity purposes unless the following minimum criteria are satisfied:
>
> . . . .
>
> (iv) The motor vehicle emissions budget(s), when considered together with all other emissions sources, is consistent with applicable requirements for reasonable further progress, attainment, or maintenance (whichever is relevant to the given implementation plan submission)[.]

*Id.* Quoting only portions of the conformity rule, Petitioners argue that the rule requires that the milestone-year budgets be "consistent with . . . attainment." *Id.* But Petitioners' repeated

quotation of only part of the rule is misleading. The full text of the rule flatly contradicts their reading. A budget must be "consistent with applicable requirements for *reasonable further progress*, attainment, *or* maintenance (*whichever is relevant to the given implementation plan submission*)." *Id.* (emphases added). The plain-text meaning of the rule is clear: For budgets concerning milestone years, reasonable further progress requirements are relevant; for budgets concerning the attainment year, attainment requirements are relevant; and for budgets concerning maintenance years, maintenance requirements are relevant. Because the approved budgets at issue concern milestone years only, the only relevant requirements are reasonable further progress requirements; attainment requirements are not relevant.

The definition of "motor vehicle emissions budget" further supports the EPA's interpretation: "Motor vehicle emissions budget is that portion of the total allowable emissions defined in the submitted or approved control strategy implementation plan revision or maintenance plan for a certain date *for the purpose of meeting reasonable further progress milestones **or** demonstrating attainment* or maintenance of the NAAQS . . . ." 40 C.F.R. § 93.101 (all emphases added). Consistent with the EPA's interpretation of § 93.118(e)(4)(iv), a budget for any given year has a purpose *either* of meeting reasonable further progress *or* of demonstrating attainment. Petitioners' arguments to the contrary are unavailing, particularly given the very strong deference owed to the EPA in this context. *Thomas Jefferson Univ.*, 512 U.S. at 512.

## B.  *PM-2.5 Implementation Rules*

**[6]** Petitioners next argue that the EPA's action violated the PM-2.5 implementation rules, 40 C.F.R. §§ 51.1007-51.1009. Unlike the conformity rule, however, the PM-2.5 implementation rules do not address what the EPA must consider when making an adequacy determination.

Instead, those rules describe other requirements, such as what a SIP must contain.

Relevant here, § 51.1007(a) specifies that each state must submit an attainment demonstration "as expeditiously as practicable" and that each state's "strategies must be consistent with requirements in § 51.1009 for RFP [reasonable further progress]."[4] Section 51.1007(b) requires that a SIP must provide for attainment "as expeditiously as practicable" and "must include RFP milestones in accordance with § 51.1009."

In turn, § 51.1009(a) requires that the SIP "must demonstrate reasonable further progress as provided in § 51.1009(b) through (h)." Subsections (b) and (c) specify the milestone years, if any, for which a SIP must demonstrate reasonable further progress. If the SIP demonstrates attainment within five years of the base year, then no reasonable further progress demonstration is required. *Id.* § 51.1009(b). If the SIP demonstrates attainment between five and eight years from the base year, then it must demonstrate reasonable further progress for milestone year 2009. *Id.* § 51.1009(c)(1). Finally, if the SIP demonstrates attainment between nine and ten years from the base year, then it must demonstrate reasonable further progress for milestone years 2009 and 2012. *Id.* § 51.1009(c)(2).

Section 51.1009(d) states that the reasonable further progress plan "must demonstrate that in each applicable milestone year, emissions will be at a level consistent with generally linear progress in reducing emissions between the base year and the attainment year." Subsection (f) details the calculations for achieving "generally linear progress":

---

[4]Although we decline to use the abbreviation "RFP" for the term "reasonable further progress," for simplicity, we maintain the agency's use of the abbreviation in its regulations. The agency uses the term as both a noun and an adjective, making substitution of the full term awkward.

In the benchmark RFP plan, the State must identify direct PM-2.5 emissions and PM-2.5 attainment plan precursors regulated under the PM-2.5 attainment plan and specify target emission reduction levels to be achieved during the milestone years. In developing the benchmark RFP plan, the State must develop emission inventory information for the geographic area included in the plan and conduct the following calculations:

(1) For direct PM-2.5 emissions and each PM-2.5 attainment plan precursor addressed in the attainment strategy, the full implementation reduction is calculated by subtracting the full implementation inventory from the baseline year inventory.

(2) The "milestone date fraction" is the ratio of the number of years from the baseline year to the milestone inventory year divided by the number of years from the baseline year to the full implementation year.

(3) For direct PM-2.5 emissions and each PM-2.5 attainment plan precursor addressed in the attainment strategy, a benchmark emission reduction is calculated by multiplying the full implementation reduction by the milestone date fraction.

(4) The benchmark emission level in the milestone year is calculated for direct PM-2.5 emissions and each PM-2.5 attainment plan precursor by subtracting the benchmark emission reduction from the baseline year emission level. The benchmark RFP plan is defined as a plan that achieves benchmark emission levels for direct PM-2.5 emissions and each PM-2.5 attainment plan precursor addressed in the attainment strategy for the area.

(5) In comparing inventories between baseline and future years for direct PM-2.5 emissions and each PM-2.5 attainment plan precursor, the inventories must be derived from the same geographic area. The plan must include emissions estimates for all types of emitting sources and activities in the geographic area from which the emission inventories for direct PM-2.5 emissions and each PM-2.5 attainment plan precursor addressed in the plan are derived.

(6) For purposes of establishing motor vehicle emissions budgets for transportation conformity purposes (as required in 40 CFR part 93) for a PM-2.5 nonattainment area, the State shall include in its RFP submittal an inventory of on-road mobile source emissions in the nonattainment area.

*Id.* § 51.1009(f).

**[7]** We agree with the EPA that nothing in those rules mandates that the EPA consider attainment data when determining the adequacy of milestone-year budgets. Indeed, as the calculation method detailed in § 51.1009(f) makes clear, to calculate a given milestone-year budget, the only information related to attainment that the EPA needs is the target attainment-year emissions level (described in the regulation as the "full implementation inventory," *id.* § 51.1009(f)(1)).

Petitioners read the implementation rules differently. They assert in their opening brief that, "[a]s the *starting point* for determining the emission reductions that must be achieved for each [reasonable further progress] milestone year, the rule requires that 'the State must submit an attainment demonstration showing that the area will attain the annual and 24-hour standards as expeditiously as practicable.' " (Quoting 40 C.F.R. § 51.1007(a) (emphasis added).) Petitioners reason that, because California has not achieved the "starting point"

in the analysis, the EPA's adequacy determination is contrary to law.

**[8]** Petitioners' reading is plausible. Section 51.1007(a) begins: "For any area designated as nonattainment for the PM-2.5 NAAQS, *the State must submit an attainment demonstration showing that the area will attain the annual and 24-hour standards* as expeditiously as practicable." (Emphasis added.) That text suggests that, before any calculations can be done, the state must demonstrate attainment, at least in theory. The same suggestion is found in § 51.1009(c): "For any area for which the State *submits to EPA an approvable attainment demonstration* and [SIP] that demonstrates the area needs an attainment date of more than five years from the date of designation, the State also must submit an RFP plan." (Emphasis added.) That text suggests that, before the state calculates milestone-year budgets, it must submit an "approvable attainment demonstration."

**[9]** Although Petitioners' reading is plausible, the implementation rules do not state unambiguously that the submission of an attainment demonstration is the "starting point" for the analysis, and they do not unambiguously require the consideration of attainment when approving milestone-year budgets. Section 51.1007(a) properly describes the requirement that a state must demonstrate attainment. It may *suggest* a starting point in the analysis, but it does not *mandate* one. Similarly, § 51.1009(c), taken literally, means that the failure of the state to submit an "approvable attainment demonstration" means that the state need not submit a reasonable further progress plan at all. That literal reading, however, makes no sense. In context, the intent of that provision is only to require a reasonable further progress plan in the event, as here, that the state cannot achieve attainment within five years. *Compare* 40 C.F.R. § 51.1009(b) (attainment within five years) *with id.* § 51.1009(c) (attainment beyond five years). In sum, the suggestion of a "starting point" in some provisions of the implementation rules is just that—a suggestion. The rules do

not *require* the EPA to begin with an acceptable attainment demonstration.

**[10]** Moreover, and critically, the EPA has offered a reasonable alternative interpretation. It is indisputable that the state must provide a valid attainment demonstration as expeditiously as practicable, and it is also indisputable that its SIP must demonstrate attainment. But those regulations do not speak to whether the EPA can approve milestone-year budgets for purposes of transportation purposes. As discussed above, § 51.1009(f) requires only that the EPA calculate the target emissions level.

Petitioners also argue that, even if their reading is not compelled by the plain text of the regulation, their reading is "compelled by . . . other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.*, 512 U.S. at 512 (internal quotation marks omitted). On this point, Petitioners refer primarily to court decisions explaining the operation of the applicable regulations. Although Petitioners cite correct statements of the law, their cases do not address the applicability of the implementation rules to a milestone budget. For instance, Petitioners correctly point out that, before the EPA approves a SIP, it must determine that the measures in the SIP will achieve attainment. *See Hall v. EPA*, 273 F.3d 1146, 1159 (9th Cir. 2001) ("[T]he EPA must determine the extent of pollution reductions that are required and determine whether the emissions reductions effected by the proposed revisions will be adequate to the task."); *see also Envtl. Def. Fund*, 167 F.3d at 650-51 (remanding to the agency for further rulemaking because of the automatic "adequacy" finding provision in the 1997 version of the conformity rule). None of those statements of law speaks to the legal issue here: the EPA's adequacy determination, for transportation conformity purposes, of a milestone-year budget.

**[11]** In summary, the EPA's reading of its own regulations, which does not require an approvable attainment demonstra-

tion, is reasonable. Accordingly, an alternative reading to the agency's interpretation is not "compelled by the regulation's plain language." *Thomas Jefferson Univ.*, 512 U.S. at 512.

We have carefully considered all of Petitioners' other arguments as well, but we find none of them persuasive.[5]

**Petition DENIED.**

---

[5]After oral argument in this case, we decided *Association of Irritated Residents v. EPA (AIR)*, 632 F.3d 584 (9th Cir. 2011). With respect to motor vehicle emission budgets, we addressed the statutory requirement that a SIP include transportation control measures " 'to offset any growth in emissions from growth in vehicle miles traveled.' " *Id.* at 595 (quoting 42 U.S.C. § 7511a(d)(1)(A)). We concluded, at step one of the *Chevron* analysis, that the EPA's interpretation of the statutory phrase "any growth in emissions" was erroneous. *Id.* at 596-97. We therefore granted the petition for review. *Id.* at 597. Although we mentioned adequacy determinations with respect to motor vehicle emissions budgets in the factual background section, *id.* at 588, we did not address the issue that we resolve in this case—whether an adequacy determination of a milestone-year motor vehicle emissions budget requires the EPA to consider attainment data.

Because *AIR* touched on similar topics, we ordered supplemental briefing on the effect of *AIR* on this case. We conclude that there is none. In contrast to *AIR*, we address here the proper interpretation of regulations (not a statute) and, in any event, we conclude that no plain meaning exists. Additionally, our brief mention of "preliminary adequacy determinations regarding . . . [motor vehicle emissions budgets]" in *AIR* was background information only and does not contravene our analysis here. *Id.*