**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 4, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CENTER FOR BIOLOGICAL
DIVERSITY; 350 COLORADO,

    Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL S.
REGAN, Administrator, United States
Environmental Protection Agency,

    Respondents.

--------------------------

THE STATE OF COLORADO,

    Intervenor-Respondent.

No. 23-9565

_____

**Petition for Review of an Order from the Environmental Protection Agency**
**(EPA No. EPA-R08-OAR-2022-0632)**
_____

Ryan Maher (Ken Fowler, Erin Kincaid, Wyatt Sassman, and Asha Brundage-Moore,
Environmental Law Clinic, University of Denver, Sturm College of Law, Denver,
Colorado, with him on the briefs), Center for Biological Diversity, Washington, D.C., for
Petitioners.

Lucy E. Brown, Attorney (Todd Kim, Assistant Attorney General, with her on the brief),
Environment and Natural Resources Division, United States Department of Justice,
Washington, D.C., for Respondents.

Shannon Stevenson, Robyn Wille, Laura Terlisner Mehew, William Allen, Michael D. McMaster, and Rylie Slaybaugh, Natural Resources and Environment, Colorado Department of Law, Denver, Colorado, filed a brief for Intervenor-Respondent.

_____

Before **TYMKOVICH**, **MORITZ**, and **CARSON**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

The Center for Biological Diversity and 350 Colorado (together, petitioners) challenge the Environmental Protection Agency (EPA) rule partially approving Colorado's plan to reduce ozone pollution. The Clean Air Act, 42 U.S.C. §§ 7401–7671q, required Colorado to lower ozone to acceptable levels by July 2021. But by the time the EPA issued its approval, that deadline had already passed—and the state's plan had failed to attain the intended reduction.

Petitioners ask the court to vacate the EPA's approval as to two components of Colorado's plan, asserting that the approval violates the Clean Air Act in three ways. Because we disagree with petitioners' reading of the law and the record, we deny the petition for review.

## Background

The Clean Air Act takes "a cooperative-federalism approach to regulat[ing] air quality." *U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012). In broad terms, it empowers the EPA to set air-quality standards; directs states to develop plans for meeting them; and authorizes the EPA to approve, reject, or (in

some cases) supplant those state plans with federal ones. *See Ctr. for Biological Diversity v. EPA*, 82 F.4th 959, 962 (10th Cir. 2023); 42 U.S.C. §§ 7409–10.

In 2008, the EPA exercised its authority to set a national ambient air quality standard (NAAQS) for ozone. *See* National Ambient Air Quality Standards for Ozone, 73 Fed. Reg. 16436 (Mar. 27, 2008). The EPA measures ozone levels in defined geographic areas, called "air quality control region[s]," against its NAAQS benchmark. 42 U.S.C. § 7407(b)(1). It designates regions that comply with the NAAQS as "attainment" areas and those that don't as "nonattainment" areas. 42 U.S.C. § 7407(d). And it classifies nonattainment areas as "marginal," "moderate," "serious," "severe," or "extreme," depending upon the degree of ozone pollution. *Id.* § 7511(a)(1).

To attain these NAAQS, states must develop and submit state implementation plans (SIPs) providing for "implementation, maintenance, and enforcement of" the 2008 ozone NAAQS within their borders. *Id.* § 7410(a)(1); *see also EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014). SIPs are subject to different requirements, depending on how the areas within state borders are designated and classified. *See* 42 U.S.C. § 7511a. States like Colorado with nonattainment-designated areas must show how they will attain the NAAQS—that is, reduce pollution levels to comply with EPA standards—by a statutorily defined deadline, or "attainment date." *Id.* § 7511(a)(1). If an area does not sufficiently reduce its pollution by that attainment date, it generally gets downgraded to the next nonattainment classification. *See Id.* § 7511(b)(2)(A). This reclassification gives an

3

area more time to achieve attainment, but it also comes with a stricter set of requirements. *See S. Coast Air Quality Mgt. Dist. v. EPA*, 472 F.3d 882, 887 (D.C. Cir. 2006). These requirements are cumulative, meaning moderate-classified areas must also meet requirements for marginal areas, serious-classified areas must meet requirements for marginal and moderate areas, and so on. *See* 42 U.S.C. § 7511a.

In 2019, the EPA downgraded the Denver-North Front Range area (Denver area) to "serious" nonattainment. *See* Failure to Attain and Reclassification of Denver Area for 2008 Ozone Standard, 84 Fed. Reg. 70897 (Dec. 26, 2019) [hereinafter "Serious Reclassification"]. That action pushed the Denver area's attainment date back to July 2021. *See id.* at 70898. It also triggered the state's duty to submit SIP revisions to comply with the more onerous requirements for "serious" nonattainment areas. *See* 42 U.S.C. § 7511a(c), (i). Consistent with those heightened standards, Colorado submitted SIP revisions incorporating three relevant components. *See* Conditional and Limited Approval of Colorado's Serious Attainment Plan for the 2008 Ozone Standard for the Denver Nonattainment Area, 88 Fed. Reg. 29827, 29828 (May 9, 2023) [hereinafter "Approval"].

First, Colorado included an **attainment demonstration,** which is a sophisticated analysis showing that a SIP will "provide for attainment of the ozone [NAAQS] by the applicable attainment date." 42 U.S.C. § 7511a(c)(2)(A). The EPA assesses attainment based on pollution data from the year preceding the attainment date, called the attainment year. For Colorado, the attainment deadline was July 2021, so the attainment year was 2020.

Second, Colorado included a **reasonable-further-progress demonstration**, which shows "annual incremental reductions in [ozone] emissions . . . required by [statute or the EPA] for the purpose of ensuring attainment of the applicable [NAAQS] by the [attainment] date." 42 U.S.C. § 7501(1). For "serious" nonattainment areas, incremental reductions must generally average at least three percent per year over each three-year period until attainment. *Id.* § 7511a(c)(2)(B). The EPA evaluates a state's proof of compliance with reasonable-further-progress targets in "milestone" years. *Id.* § 7511a(g)(1)–(2). The relevant milestone year for Colorado was 2020, and its reasonable-further-progress demonstration projected three-percent-per-year decreases in ozone emissions. *See* Approval, 88 Fed. Reg. at 29828.

Third, Colorado included **motor-vehicle-emissions budgets**, which allocate a "portion of the total allowable [ozone] emissions" in a SIP "to highway and transit[-]vehicle use and emissions" for purposes of meeting reasonable-further-progress milestones or demonstrating attainment. 40 C.F.R. § 93.101. Colorado's 2020 motor-vehicle-emissions budget was "consistent with the [reasonable-further-progress] demonstration." Approval, 88 Fed. Reg. at 29828.

Once submitted, Colorado's SIP was in EPA hands. The EPA is charged with timely reviewing SIP submissions for compliance with statutory and regulatory requirements. *See* 42 U.S.C. § 7410(k). Among other things, this means ensuring that (1) projected emissions reductions are based on federally enforceable, or "creditable," emissions controls, *Id.* § 7511a(b)(1)(C), (c)(2)(B); and (2) any

revisions would not "interfere with any applicable . . . [Clean Air Act] requirement" and cause backsliding, *Id.* § 7410(*l*).

The EPA can approve or reject entire plans or individual SIP components, and its choice of action carries steep consequences for states. *See Id.* § 7410(k)(3). If the EPA rejects a SIP, the state must submit revisions or let the EPA step in and develop its own federal implementation plan. *See Id.* § 7410(c). If it approves a SIP, any included controls become federally enforceable. *See Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1237 (10th Cir. 2021). And states can rely on approved motor-vehicle-emissions budgets to unlock federal and metropolitan-planning-organization support for transportation and improvement projects. *See* 42 U.S.C. § 7506(c)(1) (predicating federal and metropolitan support on "conform[ity] [with] an implementation plan"); 40 C.F.R. §§ 93.109(c), 93.118 (allowing states to rely on approved motor-vehicle-emissions budgets to show conformity with implementation plans).

While Colorado's revisions were under EPA review, the Denver area's July 2021 attainment date came and went. *Compare* Serious Reclassification, 84 Fed. Reg. 70897, *with* Approval, 88 Fed. Reg. 29827. Ozone levels did not drop enough to meet the 2008 NAAQS by that deadline, so in October 2022, the EPA reclassified the Denver area from "serious" to "severe" nonattainment. *See* Attainment Determinations, Attainment Date Extensions, and Area Reclassifications for the 2008 Ozone National Ambient Air Qualify Standards, 87 Fed. Reg. 60926 (Oct. 7, 2022) [hereinafter "Severe Reclassification"].

6

Despite the state's failure to achieve attainment and the resulting reclassification, the EPA approved certain components of Colorado's "serious" SIP submissions in May 2023, after notice and comment. *See* Proposed Approval of Colorado's Serious Attainment Ozone Standard Plan for the Denver Nonattainment Area, 87 Fed. Reg. 67617 (Nov. 9, 2022); Approval, 88 Fed. Reg. at 29827. As relevant here, the EPA approved the reasonable-further-progress demonstration, determining that Colorado showed emissions would fall by at least three percent per year from 2018 to 2020. *See* Approval, 88 Fed. Reg. at 29828. It also approved the motor-vehicle-emissions budget "for the 2020 [reasonable-further-progress] milestone year," determining that it was "consistent with the [reasonable-further-progress] demonstration for the 2008 ozone NAAQS . . . and me[t] the other criteria in 40 C.F.R. [§] 93.118(e)." *Id.* And it determined that the SIP's projected emissions reductions were based on creditable, federally enforceable measures. *Id.* Finally, the EPA determined that the SIP revisions complied with 42 U.S.C. § 7410(*l*)'s anti-backsliding mandate because they would not interfere with any applicable Clean Air Act requirement. *Id.* at 29831.

Petitioners, who opposed these approvals in comments to the EPA, filed this petition for review. Colorado intervened in support of the EPA.

**Analysis**

Petitioners attack the EPA's final rule partially approving Colorado's "serious" SIP revisions. We review such challenges under the Administrative Procedure Act, which instructs us to "hold unlawful and set aside agency action[s]" that are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," taking "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. Although this is a "deferential" standard of review, *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012), we do not defer to the EPA's view of the law, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024). Rather, we "exercise independent judgment in determining the meaning of statutory provisions." *Id.*

Petitioners specifically argue that (1) the EPA unlawfully approved the reasonable-further-progress and motor-vehicle-emissions-budget components in 2022 after the state missed its 2021 attainment deadline, (2) Colorado improperly included state-only emissions reductions in its reasonable-further-progress calculations, and (3) the plan violated the Clean Air Act's anti-backsliding provision. We consider each argument in turn.

## I.    Approvals Following Attainment Deadline

### A.    Reasonable-Further-Progress Demonstration

Petitioners first contend that the EPA unlawfully approved Colorado's reasonable-further-progress demonstration. They argue that the Clean Air Act requires such demonstrations to incorporate emissions reductions sufficient to achieve attainment by the applicable deadline. And because the Denver area failed to achieve attainment in time, petitioners contend, the EPA's approval of Colorado's reasonable-further-progress demonstration violated the law. We disagree with petitioners' interpretation of the statutory scheme and reject this challenge.

Under the Clean Air Act, reasonable-further-progress demonstrations must show certain percentage reductions in emissions on a fixed schedule. *See Nat. Res. Def. Council*, 571 F.3d at 1258 (describing reasonable-further-progress provisions as imposing "fixed percentage reductions" in emissions "on a specified schedule"). For "serious" nonattainment areas, SIPs must reduce admissions "at least [three] percent . . . each year" until the attainment date. 42 U.S.C. § 7511a(c)(2)(B)(i). The EPA may approve lower annual reductions if it determines that the SIP "includes all [emissions-reducing] measures that can feasibly be implemented in the area, in light of technological availability." *Id.* § 7511a(c)(2)(B)(ii).

According to petitioners, simply meeting those fixed benchmarks cannot satisfy the reasonable-further-progress requirement if the emissions reductions will not additionally guarantee attainment. But that argument conflates the reasonable-further-progress demonstration with attainment demonstration. Reasonable further progress ensures that states consistently reduce their emissions over time and prevents states from delaying implementation of emissions-control strategies until just before the attainment deadline. *See id.* § 7511a(c)(2)(B). It does not, alone, ensure that a state will achieve attainment. That is why the Clean Air Act separately requires states to submit attainment demonstrations—modeling that proves an area will meet "the ozone [NAAQS] by the applicable attainment date." *Id.* § 7511a(c)(2)(A). To be sure, reaching attainment may require states to impose more significant reductions beyond those mandated in connection with reasonable further

9

progress. But any such disparity, as the EPA explains, is addressed through other required components of the SIP, such as the attainment demonstration.

Petitioners nevertheless lean on two provisions to resist this common-sense interpretation of the statutory SIP requirements. The first is the Clean Air Act's overarching definition of reasonable further progress:

> The term "reasonable further progress" means such annual incremental reductions in emissions of the relevant air pollutant as are required by [part D of Title I of the Clean Air Act] or may reasonably be required by the [EPA] *for the purpose of ensuring attainment* of the applicable [NAAQS] by the applicable date.

42 U.S.C. § 7501(1) (emphasis added). Petitioners suggest that the "purpose of ensuring attainment" language reflects Congress's intent to ensure that reasonable-further-progress demonstrations be based on emissions reductions sufficient to achieve attainment. *Id.* We disagree. The "purpose" clause simply explains that the emissions reductions (set either by part D or the EPA) are designed to ensure the area will eventually reach attainment. *Id.* It does not require that those reductions—on their own—push the area into attainment by the applicable deadline.

Next, petitioners point to a provision governing nonattainment areas classified as "moderate" or higher. It requires "moderate," "serious," "severe," and "extreme" SIP submissions to "provide for such specific annual reductions in emissions of volatile organic compounds and oxides of nitrogen *as necessary to attain* the . . . ozone [NAAQS] by the attainment date applicable under this chapter." 42 U.S.C. § 7511a(b)(1)(A)(i) (emphasis added). But as the EPA explains, the Clean Air Act more directly identifies what is "necessary" to show reasonable further progress for "serious" SIP submissions:

10

emissions reductions of "at least [three] percent of baseline emissions each year," or a smaller reduction if "the [s]tate demonstrates to the satisfaction of the [EPA] that the [SIP] . . . includes all measures that can feasibly be implemented in the area, in light of technological availability."[1] *Id.* § 7511a(c)(2)(B). To demonstrate reasonable further progress, then, Colorado was required to show only a three-percent reduction in emissions, not a reduction necessary for attainment. The state did as much. So even though the Denver area's annual emissions reductions could not facilitate attainment by the deadline, they satisfied the reasonable-further-progress requirements for "serious" nonattainment areas under the Clean Air Act.

As a final observation, the downstream consequences of the EPA's standalone approval of reasonable-further-progress demonstrations appear less dire than petitioners suggest. They prophesy that permitting the EPA to approve components of SIPs that cannot reach attainment will allow states to "avoid more stringent regulations without ever attaining the NAAQS." Aplt. Br. 35. But states are still required to demonstrate attainment as a component of their SIPs. *See* 42 U.S.C. §§ 7511(a)(1), 7511a(c)(2)(A). And if they fail to meet attainment deadlines, states are reclassified to higher nonattainment designations with stricter statutory and regulatory requirements. *See Id.* § 7511(b)(2)(A). That is why, notwithstanding the

---

[1] This interpretation is consistent with EPA regulations, which discuss reasonable-further-progress targets for areas classified as "moderate," "serious," or "severe" in hard percentages, rather than by reference to attainment. *See* 40 C.F.R. §§ 51.1100(t), 51.1110(a); *Loper Bright*, 144 S. Ct. at 2262 (permitting courts interpreting statutes to "seek aid from the interpretations of those responsible for implementing [them]").

outcome of this action, Colorado is currently required to develop and submit SIP revisions consistent with the heightened requirements for "severe" nonattainment areas. *See Id.* § 7511a(c); Severe Reclassification, 87 Fed. Reg. 60926.

Implications aside, the text and structure of the Clean Air Act make clear that reasonable further progress and attainment are two interconnected—but distinct—requirements. While "serious" reasonable-further-progress demonstrations help smooth out emissions reductions over time, they need not alone achieve attainment. Accordingly, the EPA did not act unlawfully in approving Colorado's reasonable-further-progress demonstration after the state failed to meet its attainment deadline. 5 U.S.C. § 706(2).

### B.    Motor-Vehicle-Emissions Budgets

Petitioners likewise challenge the EPA's approval of Colorado's 2020 motor-vehicle-emissions budget because it failed to ensure attainment. Motor-vehicle-emissions budgets are governed by the EPA's transportation-conformity regulations. *See* 42 U.S.C. § 7506(c). Those regulations set out criteria for evaluating emissions budgets and preclude the EPA from approving a motor-vehicle-emissions budget unless the budget, "when considered together with all other emissions sources, is consistent with applicable requirements for reasonable further progress, attainment, *or* maintenance (whichever is *relevant* to the given implementation[-]plan submission)." 40 C.F.R. § 93.118(e)(4)(iv) (emphases added).

Petitioners argue that the "relevant" requirements for purposes of evaluating the 2020 motor-vehicle-emissions budget were the attainment requirements,

12

emphasizing that 2020 was the Denver area's attainment year. *Id.*; *see also Nat. Res. Def. Council v. EPA*, 638 F.3d 1183, 1193 (9th Cir. 2011) ("[F]or budgets concerning the attainment year, attainment requirements are relevant."). In their view, this means the EPA could not approve Colorado's 2020 motor-vehicle-emissions budget unless the budget established attainment—which, of course, it didn't, because the state failed to attain.

But as the EPA explains, 2020 was not just the attainment year: it was also a milestone year for purposes of assessing reasonable-further-progress compliance. *See* 42 U.S.C. § 7511a(g)(1)–(2). Accordingly, the EPA approved Colorado's motor-vehicle-emissions budget based on compliance with reasonable-further-progress requirements. *See Nat. Res. Def. Council*, 638 F.3d at 1193 ("For budgets concerning milestone years, reasonable[-]further[-]progress requirements are relevant . . . ."). And the EPA's authority to issue this kind of restricted approval—one that considered only reasonable-further-progress requirements in a dual milestone-plus-attainment year—stems from the disjunctive phrasing of the regulations. The regulations define motor-vehicle-emissions budgets as the portion of total emissions allocated to vehicles "for a certain date for the purpose of meeting reasonable[-]further[-]progress milestones *or* demonstrating attainment *or* maintenance of the NAAQS." 40 C.F.R. § 93.101 (emphasis added). The transportation-conformity regulations mirror that language, demanding consistency with "applicable requirements for reasonable further progress, attainment, *or* maintenance." *Id.*

13

§ 93.118(e)(4)(iv) (emphasis added). So it is enough if motor-vehicle-emissions budgets show reasonable further progress or attainment; they need not show both.

Given that the EPA's final rule acted only on Colorado's reasonable-further-progress demonstration, not the attainment demonstration, the EPA permissibly reviewed and approved the 2020 motor-vehicle-emissions budget for consistency with milestone-year targets. The budget's incompatibility with attainment does not preclude EPA approval in this circumstance.

## II.    State-Only Emissions Reductions

Petitioners separately argue that the EPA's approval of the reasonable-further-progress demonstration was arbitrary and capricious because Colorado took credit for emissions reductions from non-federally enforceable control measures. Under the Clean Air Act, states may include only "creditable" reductions when calculating emissions for purposes of reasonable further progress. 42 U.S.C. § 7511a(b)(1)(C); *see also id.* §§ 7410(a)(2)(A), 7511a(b)(1)(D), 7511a(c)(2)(B). Creditable reductions are those caused by "the implementation of measures required under the [SIP]." *Id.* § 7511a(b)(1)(C). Reductions from control measures not included in the SIP— colloquially termed "state-only" reductions because they are not federally enforceable—must be excised.

Petitioners allege that Colorado failed to quantify and remove state-only reductions from the models used to project emissions reductions for purposes of its reasonable-further-progress demonstration. And granted, that task can pose challenges; the technology used to gauge pollution does not always indicate whether

14

ozone levels were lower due to a federally enforceable control measure or a state-only one. But as the EPA explains, Colorado comfortably demonstrated the necessary emissions reductions based on creditable, federally enforceable measures. Indeed, the reductions attributable to federally enforceable "rules applicable to the oil and gas condensate/oil tanks category" alone are sufficient to establish reasonable further progress. Aplee. Br. 44–45.

So—even assuming Colorado's projections were tainted by state-only emissions—that error was not prejudicial. *See* 5 U.S.C. § 706 (directing courts to take "due account . . . of the rule of prejudicial error" when reviewing agency action). We accordingly decline to strike down the EPA's reasonable-further-progress approval on this basis.

## III.    Anti-Backsliding

Petitioners also assert that the EPA improperly approved SIP components that violate the Clean Air Act's anti-backsliding provision, 42 U.S.C. § 7410(*l*). Section 7410(*l*) prohibits the EPA from approving "a revision of a [SIP] if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress . . . or any other applicable [Clean Air Act] requirement." The EPA determined that Colorado's SIP revisions complied with this limitation because the emissions "will likely decrease[] as a result of [the] EPA's limited approval." App. 21592.

Petitioners counter that the SIP revisions necessarily "interfere" with attainment because the Denver area failed to attain. 42 U.S.C. § 7410(*l*). In effect,

15

they view 42 U.S.C. § 7410(*l*) as prohibiting the EPA from approving a SIP revision unless it will *guarantee* attainment. This theory asks "interfere" to do too much work. *See Takwi v. Garland*, 22 F.4th 1180, 1187 (10th Cir. 2022) (explaining that "unless otherwise defined," we give words in a statute their "ordinary" meaning (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))).

To "interfere" ordinarily means "to hamper, frustrate, or meddle in a deleterious way." Bryan A. Garner, Garner's Dictionary of Legal Usage 570 (3d ed. 2011); *see also* Merriam-Webster's Collegiate Dictionary 652 (11th ed. 2005) ("[T]o interpose in a way that hinders or impedes."). And "interference" is defined as "[a]n obstruction or hindrance." *Interference*, Black's Law Dictionary (12th ed. 2024).

A SIP revision thus satisfies 42 U.S.C. § 7410(*l*) if it does not hamper, frustrate, hinder, or impede any applicable Clean Air Act provision. *See S. Coast Air Quality Mgt. Dist.*, 472 F.3d at 900 (noting that 42 U.S.C. § 7410(*l*) precludes actions "that would hinder an area's ability to achieve prescribed[,] annual[,] incremental emissions reductions"). This reading is consistent with the EPA's longstanding view that revisions comply with 42 U.S.C. § 7410(*l*) "[a]s long as actual emissions in the air are not increased," *Ky. Res. Council, Inc. v. EPA*, 467 F.3d 986, 995 (6th Cir. 2006) (quoting Approval of Kentucky Implementation Plan, 70 Fed. Reg. 28429, 28430 (May 18, 2005)), "even if the SIP merely maintain[s] the status quo," *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1074 (9th Cir. 2014). Accordingly, because Colorado's SIP submissions were projected to *reduce* emissions—not simply maintain (let alone increase) them—the EPA's approval did not violate 42 U.S.C.

16

§ 7410(*l*). *See Ctr. for Biological Diversity v. EPA*, 75 F.4th 174, 180–82 (3d Cir. 2023) (rejecting 42 U.S.C. § 7410(*l*) challenge to EPA approval because SIP revisions would not increase emissions).

Petitioners next warn that Colorado's SIP should have prompted the EPA to conduct a more rigorous anti-backsliding analysis.[2] The appropriate analysis under 42 U.S.C. § 7410(*l*) "depend[s] on the nature of the SIP revision in question and the particular interference risk it poses." *Ctr. for Biological Diversity*, 75 F.4th at 181. For instance, when the EPA expects that a revision may increase emissions, it typically requires a state to either (1) submit an air-quality analysis showing that the revision would not interfere with any applicable requirement or (2) substitute equivalent or greater emissions reductions to preserve status quo air quality. But when the SIP revision neither weakens nor removes any pollution controls, such procedures are unnecessary because there is no reason to believe the revision will hinder attainment by worsening air quality.

Here, the EPA determined that the SIP revisions did "not relax[] standards or

---

[2] Petitioners express particular concern with SIP revisions that "would allow for [nitrogen-oxide] NAAQS violations by the Suncor Petroleum Refinery" because "Colorado issued [the refinery] a permit . . . that allows the facility to emit [nitrogen-oxide] pollution . . . well above the [applicable] NAAQS requirement." Aplt. Br. 53. But as the EPA explains, it did not take final action on proposed emission limits for gas-fueled process heaters (the equipment principally responsible for nitrogen-oxide emissions at the refinery) and thus concluded that the approved SIP revisions did not threaten to cause NAAQS violations. *See* Approval, 88 Fed. Reg. at 29828. Petitioners do not meaningfully challenge this characterization on reply. We therefore agree with the EPA that the permit issued to Suncor does not pose a 42 U.S.C. § 7410(*l*) backsliding issue.

eliminat[e] a program." App. 21592. To the contrary, Colorado incorporated categorical "Reasonably Available Control Technology" rules and other revisions that fortified emissions constraints. *Id.* And because the proposed changes would only serve to strengthen the SIP, not weaken or remove pollution controls, the EPA did not need to solicit further analysis or additional measures before concluding that the revisions would not violate 42 U.S.C. § 7410(*l*). *See* Approval, 88 Fed. Reg. at 29831; *WildEarth Guardians*, 759 F.3d at 1074. Thus, the EPA applied the appropriate level of rigor based on the nature of the SIP revisions at issue and the evidence before it. *See Ctr. for Biological Diversity*, 75 F.4th at 181. In sum, the EPA's approvals were not unlawful under 42 U.S.C. § 7410(*l*).

## Conclusion

The EPA acted lawfully when it approved the reasonable-further-progress and motor-vehicle-emissions-budget components of Colorado's plan to lower ozone levels after the state missed its deadline for meeting national ozone standards. Those approvals did not impermissibly depend on emissions reductions from state-only control measures. Nor did they contravene the anti-backsliding provision. We therefore deny the petition for review.